# NORRIS GRAIN COMPANY v. SEAFARERS' INTERNATIONAL UNION OF NORTH AMERICA, A.F.L., CANADIAN DISTRICT, AND OTHERS. EINER NORDAAS, RELATOR.[1]

September 29, 1950.

No. 35,365.

[1]Reported in 46 N. W. (2d) 94.

*Lewis, Hammer, Heaney, Weyl & Halvorson* and *William D. Gunn,* for relator.

*Holmes, Mayall, Reavill & Neimeyer* and *McCabe, Gruber, Clure, Donovan & Crassweller,* for Norris Grain Company, respondent.

*J. A. A. Burnquist,* Attorney General, and *George B. Sjoselius,* Deputy Attorney General, filed a brief as *amici curiae.*

KNUTSON, JUSTICE.

Petition for a writ of prohibition to restrain the district court of the eleventh judicial district and the judges thereof from enforcing a temporary restraining order theretofore issued or from holding a hearing on a citation for contempt for violation thereof or from holding a hearing on an order to show cause why a temporary injunction should not issue.

The restraining order under question was issued ex parte on the complaint and attached affidavits of plaintiff (respondent here), and for the purpose of this decision the facts alleged therein are taken to be true. Plaintiff in the original action and respondent here, Norris Grain Company, which will hereinafter be referred to as respondent, is a corporation organized and existing under the laws of Illinois. It is engaged in the business of buying, selling, and storing grain and in the operation of its business owns and operates grain elevators situated on the water front of the harbor of the city of Duluth in this state, to and from which elevators grain is brought and removed by rail and water transportation. A substantial amount of such water transportation is carried on in vessels owned and operated by Upper Lakes and St. Lawrence Transportation Company, Ltd., a corporation organized and existing under the laws of the Dominion of Canada, which will hereinafter be referred to as the Canadian Company for brevity. One of defendants in the original action, Seafarers'

International Union of North America, A. F. L., Canadian District, is a trades union organized and operated under the laws of the Dominion of Canada and will hereinafter be referred to as the Canadian Union. Defendant Seafarers' International Union of North America, A. F. L., Great Lakes District, is a trades union organized and operated in the Great Lakes district of the United States and will hereinafter be referred to as the Great Lakes Union.

Defendant Harold C. Banks is special organizer in Canada of the Canadian Union. Defendant Einer Nordaas, who is agent of the Great Lakes Union in the city of Duluth and surrounding territory, is the relator here and will be so designated unless otherwise indicated.

In 1938, the Canadian Company entered into a collective agreement with the Canadian Seaman's Union as bargaining representative of the company's unlicensed employes. This agreement was renewed each year up to and including the year 1949. By its terms, it was to expire under the last renewal on April 13, 1950. This latter union had fallen into disrepute. The company, pursuant to the provisions of the contract, served notice that it desired to cancel the contract at the expiration thereof. Negotiations thereafter commenced under the Industrial Relations and Disputes Investigation Act of Canada continued until June 7, 1950.

During October 1949, defendant Harold C. Banks sought to have the Canadian Company enter into a contract with the Canadian Union, whereby it would become the bargaining representative for the company's unlicensed employes. The company refused to do so, contending that it was bound to deal with the Canadian Seaman's Union until the expiration of its contract and apparently also contended that the Canadian Union had no membership among the unlicensed employes of the Canadian Company. Action to make it impossible for the company to load or unload its vessels in the United States was thereupon threatened,

which demands and threats were later repeated. The Canadian Company has no dispute with its employes.

None of respondent's employes are represented by either the Canadian Union or the Great Lakes Union or any of the defendants. No dispute exists between respondent and its employes, and the relationship with its employes is entirely amicable.

On August 1, 1950, the steamer *Howard Shaw*, owned and operated by the Canadian Company, pursuant to previous arrangements with respondent, docked at one of its elevators in Duluth to receive a cargo of grain intended for shipment to Canada and there to be transported abroad. The complaint then contains these allegations upon which decision must rest:

"That notwithstanding the fact that neither plaintiff nor any of its employees had any prior relations whatever with any of said defendants, said defendants unlawfully combined to cause plaintiff's said premises to be picketed and persuasion used so that plaintiff's employees and others who would normally engage in the operation of loading said vessel and operation of said elevator have, because of such picketing and persuasion used by defendants, ceased performing such services for plaintiff, and defendants by said unlawful acts have caused and will cause loss to plaintiff and its employees. *That such unlawful acts are being done to induce or compel plaintiff to refrain from doing business with said Canadian Corporation because of said failure of agreement between said Canadian Corporation and said defendant Canadian Union.*

"The plaintiff is informed and believes that defendants have likewise threatened to commit such unlawful acts in connection with other vessels of said Canadian Corporation as the same arrive in the future at plaintiff's premises." (Italics supplied.)

Upon application of respondent, based on its complaint and attached affidavits, the district court of the eleventh judicial district on August 1, 1950, issued an order to show cause return-

able on August 7, 1950, why a temporary injunction should not be issued—

"Restraining and enjoining the above named defendants, or any of them, or any persons acting under them, from unlawfully combining to cause the premises of plaintiff described therein to be picketed in any way, and restraining and enjoining said persons from instructing, procuring, persuading or incite [sic] employees of plaintiff who normally work in said elevators, and others who normally engaged in the operation of loading or unloading any vessel docked at plaintiff's elevators to refuse to enter said premises, or load or unload cargo onto or from such vessels,"

and its order, ex parte, restraining defendants from doing any of the acts for which the temporary injunction was sought pending a hearing on the motion for such temporary injunction. Defendants thereafter appeared specially requesting that the temporary restraining order be dismissed on the grounds that the court did not have jurisdiction over the subject matter involved. This application was denied upon condition that respondent post a $2,000 bond, which condition was later complied with by respondent. On August 4, 1950, based upon an affidavit of respondent's counsel setting forth that picketing had continued in violation of the court's restraining order, the court issued its order to show cause why defendants "or any of them above named or any person or persons acting under them or their agents" should not answer to charges of contempt. On application of relator (Einer Nordaas), we issued our alternative writ of prohibition restraining the enforcement of said restraining order or from holding a hearing on the order to show cause why a temporary injunction should not issue or from holding a hearing upon the order to show cause why defendants should not answer for contempt.

The matter is here on the application of relator to make such writ absolute.

It is the contention of relator, first, that jurisdiction over the controversy here involved comes within the Labor Management

Relations Act, 1947, 29 USCA, § 141, *et seq.*, and therefore the courts of this state are without jurisdiction over the subject matter; secondly, that, even if this is not true, the court lacked jurisdiction to issue a restraining order without full compliance with the procedural requirements of the Minnesota labor disputes and injunction act. M. S. A. 185.02, *et seq.*, or of the Minnesota labor relations act. § 179.14.

Respondent contends that, inasmuch as the National Labor Relations Board has no jurisdiction over the Canadian Company or the Canadian Union, the federal act does not apply, and furthermore that the picketing was unlawful for the reason that it was false[2] and may therefore be enjoined by our courts.

We are confronted at the outset with a motion to quash the alternative writ of prohibition upon the grounds that the writ of prohibition is a collateral attack upon the court's order and that M. S. A. c. 185 furnishes an adequate remedy by appeal.

■ In Nemo v. Hotel & Restaurant Employees' Local No. 556, 227 Minn. 263, 267, 35 N. W. (2d) 337, 340, where we restated the three essentials that will justify issuance of a writ of prohibition, we said:

"3. Three things are essential to justify the issuance of the writ. It must appear (1) that the court, officer, or person against whom it issues is about to exercise judicial or quasi-judicial power; (2) that the exercise of such power by such court, officer, or person is unauthorized by law; and (3) that it will result in injury for which there is no other adequate remedy at law. State ex rel. Hahn v. Young, 29 Minn. 474, 523, 9 N. W. 737, 738; State ex rel. Roberts v. Hense, 135 Minn. 99, 160 N. W. 198."

[2] The record does not disclose either from the complaint or attached affidavits what the banners carried by the pickets contained. From respondent's brief we gather that the original banner carried the words: "American Federation of Labor Maritime Union Supports Seafarers' International Union against Communism on Lakes"; and that a later banner carried the words: "Upper Lakes & St. Lawrence Transportation Company Unfair A. F. of L. Maritime Trades Council."

In support of its contention, respondent relies upon Reid v. Independent Union of all Workers, 200 Minn. 599, 275 N. W. 300, 120 A. L. R. 297, and Robinette v. Price, 214 Minn. 521, 526, 8 N. W. (2d) 800, 804. The Reid case was here on certiorari to review an order of the district court for a temporary injunction restraining defendants from certain picketing activities aimed at a beauty shop maintained by plaintiff in the city of Austin. Defendant chose to ignore the injunction and violated it. At a hearing before the court he was adjudged guilty of contempt. The answer had not been served and was not before the court when the temporary injunction was ordered. One of the issues arising from the complaint and answer, which were before the court when the hearing was had, was whether a controversy involving a labor dispute was within the definition of L. 1933, c. 416, § 12(a, c), entitled, "An act relating to labor disputes and to define and limit the jurisdiction of the courts to issue any restraining order or temporary or permanent injunction in such cases." We said (200 Minn. 600, 275 N. W. 300):

"While this writ is a direct attack on the judgment of conviction, it cannot succeed unless the temporary injunction, issued without findings of fact, was a nullity. That is because this proceeding is a collateral and not a direct attack upon that injunction, under the rule of such cases as State ex rel. Tuthill v. Giddings, 98 Minn. 102, 107 N. W. 1048. There the relator had violated the affirmative form of injunction which we call the writ of *mandamus*. It was held that it could not be collaterally impeached or avoided in a proceeding, such as the instant one, to punish the relator for his disobedience of the writ.

"In other words, in order to succeed here relator must show that the action of Judge Peterson was a nullity."

That is precisely the question before us in the instant case.

■ Where the court has no jurisdiction over the subject matter and that fact appears from the face of the record itself, its orders are a nullity. Prohibition, insofar at least as it tests the

jurisdiction of the court to act at all, is a direct attack. Here, the court issued its restraining order ex parte and solely upon the complaint and the attached affidavit. Relator questions the jurisdiction of the court to act in the matter at all and also raises the question whether the court could act as it did without first complying with our state laws. In that respect, this proceeding is a direct attack. In the Reid case (200 Minn. 604, 275 N. W. 302), we did recognize that prohibition is always a direct attack.

In that case, there was no conflict between state and federal courts. The question was not whether the court had jurisdiction to act at all, but whether under our state laws, it had jurisdiction to act as it did. In order for the court to determine that question, it was first necessary to find certain facts to ascertain whether the controversy would come within the provisions of our laws limiting the court's power to issue an injunction. Much the same was true in the case of United States v. United Mine Workers of America, 330 U. S. 258, 67 S. Ct. 677, 91 L. ed. 884. Here, the question is whether the state court has any jurisdiction over the subject matter at all. The complaint and attached affidavits are not traversed. They must be taken as true. Hence, there is no need of any further findings by the court. We believe that on the face of the record the decisive question may be determined.

The mere fact that M. S. A. 185.15 provides an expeditious method for review in a labor dispute does not give the court jurisdiction to act if it affirmatively appears from the face of the record that such jurisdiction is lacking. Neither is Robinette v. Price, 214 Minn. 521, 526, 8 N. W. (2d) 800, 804, any authority to the contrary, where we held that the court had jurisdiction over the subject matter, and said:

"* * * Jurisdiction of the subject matter means authority to hear and determine a particular class of actions and the particular questions which the court assumes to decide."

The question here is whether such jurisdiction exists. In the case of Matter of Baltimore Mail S. S. Co. v. Fawcett, 269 N. Y.

379, 383, 388, 199 N. E. 628, 629, 632, 104 A. L. R. 1068, the New York court of appeals, reversing the order of the inferior supreme court denying a motion for a writ of prohibition, said:

"* * * A decision or order of a court or magistrate acting without jurisdiction is void, and though, until reversed or vacated, it may cause annoyance or even damage, such grievances may, as a general rule, be redressed by the ordinary remedies of appeal, motion to vacate, or habeas corpus proceedings. Such remedies may, it is true, be inconvenient, and, at times, incomplete. The consequences of judicial error are not entirely erased, though the error be subsequently corrected; the consequences of judicial usurpation may be serious, and in part, irremediable by subsequent rebuke. *The writ of prohibition was devised to halt a threatened judicial usurpation of jurisdiction before it causes damage.* 'It is in effect an injunction against a court' (People ex rel. Livingston v. Wyatt, *supra*) [186 N. Y. 383, 79 N. E. 330, 10 L. R. A. (N. S.) 159, 9 Ann. Cas. 972], * * *.

\* \* \* \* \*

"* * * *A court without jurisdiction of the subject-matter of an action can acquire no jurisdiction by erroneous decision that it has jurisdiction.* (Cf. Bank of Jasper v. First Nat. Bank, 258 U. S. 112, 42 S. Ct. 202, 66 L. ed. 490.) A judgment thereafter rendered by default is void (Guerin Mills v. Barrett, 254 N. Y. 380, 173 N. E. 553), and a defendant may raise and reiterate the objection of want of jurisdiction at any stage." (Italics supplied.)

See, also, Huhn v. Foley Bros. Inc. 221 Minn. 279, 22 N. W. (2d) 3, where, by a writ of prohibition, we enjoined the municipal court of St. Paul from proceeding in a case in which it had no jurisdiction.

■ The law is now settled that where a case involves a labor dispute in the field of interstate or foreign commerce covered by the national Labor Management Relations Act, 1947, the National Labor Relations Board (hereinafter referred to as N.L.R.B.) has exclusive jurisdiction and the state courts have none. It is not

a question of whether N.L.R.B. has acted or what its action will be, but rather whether congress has asserted its power to regulate that relationship. Pittsburgh Railways Co., etc., Employees' Case, 357 Pa. 379, 54 A. (2d) 891, 174 A. L. R. 1045; Linde Air Products Co. v. Johnson (D. C.) 77 F. Supp. 656. The last case involved an unauthorized attempt on the part of the Minnesota labor conciliator to determine the bargaining rights for employes of plaintiff under the Minnesota labor relations act. The case was heard by a two-judge court. In its decision the court said (77 F. Supp. 658):

"* * * By its legislation in the Labor-Management Relations Act, 1947, Congress has usurped the field of labor relations where the employer and employees are engaged in interstate commerce. The determination, therefore, of the appropriate bargaining unit of plaintiff's employees is exclusively within the jurisdiction of the National Labor Relations Act. Any state power in that regard is therefore suspended and cannot be constitutionally exercised. *There is no concurrent jurisdiction.* This seems to be the clear teaching of the Bethlehem Steel Company case, 330 U. S. 767, 67 S. Ct. 1026, 91 L. ed. 1234, the Pittsburgh Railway Company case, 357 Pa. 379, 54 A. 2d 891, and the decision of the Third Circuit Court of Appeals in Food, Tobacco, Agricultural, and Allied Workers Union v. Smiley, 3 Cir., 164 F. 2d 922. Attention may be directed to the language of the court in the Pittsburgh Railway Company case, which succinctly sets forth the view of that court on the identical question presented herein, page 896 of 54 A. 2d: 'The criterion to determine validity of the exercise of state power is not whether the agency administering federal law has acted upon the relationship in a given case; rather, it is whether Congress has asserted its power to regulate that relationship. The Pennsylvania Labor Relations Board could not constitutionally entertain the petition for determination of the bargaining unit and certification of a bargaining agent. In so doing, it was acting upon subject matter, regarding which Congress had asserted its

power of regulation and jurisdiction over which had properly been delegated to the National Labor Relations Board. It is unnecessary to pass upon other issues presented in these appeals.'" (Italics supplied.)

In the case of Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U. S. 767, 67 S. Ct. 1026, 91 L. ed. 1234, a conflict between jurisdiction of the New York Labor Relations Board and the National Labor Relations Board concerning the organization of foremen of plaintiff's plant was involved. In holding that the federal act prevented the state from taking any action, the court said (330 U. S. 775, 67 S. Ct. 1031, 91 L. ed. 1247):

"'* * * the power to decide a matter can hardly be made dependent on the way it is decided. As said by Mr. Justice Holmes for the Court, 'When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition * * *.' Charleston [& W. C.] R. Co. v. Varnville [Furniture] Co. 237 U. S. 597, 604, 35 S. Ct. 715, 716, 717, 59 L. ed. 1137, 1140, Ann. Cas. 1916D, 333. * * * The State argues for a rule that would enable it to act until the federal board had acted in the same case. But we do not think that a case by case test of federal supremacy is permissible here. The federal board has jurisdiction of the industry in which these particular employers are engaged and has asserted control of their labor relations in general. * * * We do not believe this leaves room for the operation of the state authority asserted."

This decision was followed in La Crosse Tel. Corp. v. Wisconsin Employment Relations Board, 336 U. S. 18, 69 S. Ct. 379, 93 L. ed. 463. That case involved the certification of a bargaining representative for the employes of plaintiff. The circuit court of Wisconsin held that the Wisconsin board had no jurisdiction. The supreme court of Wisconsin reversed. 251 Wis. 583, 30 N. W. (2d) 241. The Supreme Court of the United States reversed the Wisconsin court, following the Bethlehem Steel Co. case. See,

also, International Union, etc., v. Wisconsin Employment Relations Board, 336 U. S. 245, 69 S. Ct. 516, 93 L. ed. 651.

In commenting on the decision in the Bethlehem Steel Co. case, the supreme court of Pennsylvania in the case of Pittsburgh Railways Co., etc., Employees' Case, 357 Pa. 379, 386, 54 A. (2d) 891, 895, said:

"* * * The clear implication of the decision of the Supreme Court of the United States in Bethlehem Steel Co. et al. v. New York State Labor Relations Board, *supra,* is that wherever the employer-employee relationship is one over which Congress has the power of regulation and with regard to which Congress has acted, state power is suspended and cannot constitutionally be exercised. To permit the exercise of state power in such circumstances would effectively negative the supremacy of Congressional legislation.

"The criterion to determine validity of the exercise of state power is not whether the agency administering federal law has acted upon the relationship in a given case; rather, it is whether Congress has asserted its power to regulate that relationship."

See, also, Gerry of California v. Superior Court, 32 Cal. (2d) 119, 194 P. (2d) 689; In re DeSilva, 33 Cal. (2d) 76, 199 P. (2d) 6; Alonzo v. Industrial Container Corp. 193 Misc. 1008, 85 N. Y. S. (2d) 835.

In the case of Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U. S. 301, 313, 314, 69 S. Ct. 584, 591, 93 L. ed. 691, 702, where the court held that the acts there enjoined by the Wisconsin board were not covered by the federal act and as a consequence the Wisconsin board was permitted to take action under its state act, the court said:

"* * * cession of jurisdiction is to take place only where State and federal laws have parallel provisions. Where the State and federal laws do not overlap, no cession is necessary because the State's jurisdiction is unimpaired.

* * * * *

"* * * Since the enumeration by the Wagner Act and the Taft-Hartley Act of unfair labor practices over which the National Board has exclusive jurisdiction does not prevent the States from enforcing their own policies in matters not governed by the federal law, such freedom of action by a State cannot be lost because the National Board has once held an election under the Wagner Act. The character of activities left to State regulation is not changed by the fact of certification. Certification, it is true, makes clear that the employer and the union are subject to federal law, but that is not disputed. So far as the relationship of State and national power is concerned, certification amounts to no more than an assertion that as to this employer the State shall not impose a policy inconsistent with national policy, Hill v. Florida, 325 U. S. 538, 65 S. Ct. 1373, 89 L. ed. 1782, or the National Board's interpretation of that policy, Bethlehem Steel Co. v. New York S. L. R. B., 330 U. S. 767, 67 S. Ct. 1026, 91 L. ed. 1234; La Crosse Telephone Corp. v. Wisconsin E. R. B., 336 U. S. 18, 69 S. Ct. 379, 93 L. ed. 463. Indeed, the express disclaimer in § 8(3) of the National Labor Relations Act of intention to interfere with State law and the permission granted the States by § 14(b) of the Taft-Hartley Act to carry out policies inconsistent with the Taft-Hartley Act itself, would be practically meaningless if so easily avoided. For these provisions can have application, obviously, only where State and federal power are concurrent; it would have been futile to disclaim the assertion of federal policy over areas which the commerce power does not reach."

This case obviously did not intend to qualify the decision in the Bethlehem Steel Co. case, as that case was again followed in Plankinton Packing Co. v. Wisconsin Employment Relations Board, 338 U. S. 953, 70 S. Ct. 491, 94 L. ed. 588. It would seem that the Algoma case is authority only for the proposition that a state is free to act in those fields not covered by the federal act.

It remains then to examine the acts here complained of in order to determine whether such acts are covered by the federal law. The

104

pertinent portion of the complaint is set forth above. Does the complaint set forth a labor dispute? The definition of a labor dispute under the federal act, 29 USCA, § 152(9),[3] is identical in meaning with the definition of a labor dispute in the state act. M. S. A. 179.01, subd. 7.[4] The definition of "commerce" under the federal act includes commerce between a state and a foreign country as well as between the several states. 29 USCA, § 152(6).[5] 29 USCA, § 158(b)(4), makes it an unfair labor practice for a labor organization or its agents—

"to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufac-

[3]"The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

[4]" 'Labor dispute' includes any controversy concerning employment, tenure or conditions or terms of employment or concerning the association or right of representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms, tenure, or other conditions of employment, regardless of whether or not the relationship of employer and employee exists as to the disputants."

[5]"The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country."

turer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title; (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title; (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: *Provided,* That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter; * * *."

Our act, M. S. A. 179.42, provides that it shall be an unlawful act and an unfair labor practice—

"for any person or organization to combine with another, to cause loss or injury to an employer, to refuse to handle or work on particular goods or equipment or perform services for an employer, or to withhold patronage, or to induce, or to attempt to induce, another to withhold patronage or other business intercourse, for the purpose of inducing or coercing such employer to persuade or otherwise encourage or discourage his employees to join or to refrain from joining any labor union or organization or for the purpose of coercing such employer's employees to join or refrain from joining any labor union or organization."

An examination of the complaint and attached affidavits can hardly lead to any other conclusion than that respondent is engaged in interstate and foreign commerce; that a labor dispute is involved in this controversy; that the object of picketing is to bring pressure to bear on respondent to compel or induce it to cease doing business with the Canadian Company for the purpose of coercing that company into recognizing the Canadian Union as bargaining representative for its employes. Does the fact that N.L.R.B. has no jurisdiction over the Canadian Company or the Canadian Union oust the federal board of jurisdiction over the acts of the Great Lakes Union against respondent?

It is quite obvious from the congressional declaration of purpose and policy[6] that the primary purpose of the Labor Management Relations Act, 1947 (29 USCA, § 141, *et seq.*), is to prevent interference with the free flow of interstate and foreign commerce and to promote harmony between management and labor in the field of interstate and foreign commerce in order to facilitate the free flow of commerce. Douds v. Local 294 (D. C.) 75 F. Supp. 414; United Office & Professional Workers v. Smiley, 77 F. Supp. 659. It would seem that the impact upon interstate and foreign commerce as

---

[6]"Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employer, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.

"It is the purpose and policy of this chapter, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce."

well as upon the neutral employer is the same, whether the object of the picketing is to coerce an employer to recognize a labor union as bargaining agent for its employes even though N.L.R.B. has no jurisdiction over such employer as it has if the employer is subject to such jurisdiction. The federal act and our state act prohibiting such coercive action both seek to protect an innocent neutral employer who is not involved in the labor dispute. It would be a travesty to hold that such neutral employer has no right to such protection merely because the object of the picketing is to bring pressure to bear on an employer who is a citizen of a foreign country over whom N.L.R.B. has no jurisdiction. We have found no decision so holding, nor has any been cited to us by counsel for either of the parties, although it is apparent that an exhaustive search of the authorities has been made by both. We do not believe that it is necessary to so narrowly construe either the federal or the state acts. The case of In the Matter of Sailors' Union of the Pacific (AFL) and Moore Dry Dock Co., NLRB, decided May 31, 1950, Case No. 20-CC-55, which came before the National Labor Relations Board, involved facts quite similar to those in the instant case. In that case, a vessel owned by Compania Maritima Samsoc, Limitada, S. A., which will hereinafter be referred to as "Samsoc," was brought to the dry docks of the Moore company for conversion so that it could be used for a purpose other than that for which it then was suitable. Samsoc is a corporation organized under the laws of the Republic of Panama. The employes on the vessel were all or practically all Greek nationals. Moore Dry Dock Company is a California corporation, doing business at Oakland, California. The Sailors' Union of the Pacific, an affiliate of the American Federation of Labor, is a labor organization. The employes of Samsoc were paid wages far below those demanded by the union. When the vessel was in the dry docks of the Moore company, the union caused the premises to be picketed so as to prevent work from being done on the vessel. There was no dispute between the Moore company and its employes. Neither was there any dispute

so far as we can gather between Samsoc and its employes. In a report by the examiner the petition was dismissed; apparently because it was found that the picketing was primary rather than secondary.[7] The case is relied upon by both parties to support their contentions in this case. If it is authority at all, it would seem to support the contentions of relator. The important fact is not what the decision of the examiner was, but the fact that N.L.R.B. did have jurisdiction to decide the controversy. In other words, it was found to come under its jurisdiction by virtue of the national act. If that is true of the case now before us, then obviously the state court has no jurisdiction.

Nor is the case of Compania Maritima Samsoc Limitada, Sailors Union of the Pacific (AFL), CCH, 2 Labor Law Rep. (4 ed.) par. 10,081, Case No. 20-RC-809, authority to the contrary. The facts in that case are as follows: After picketing began in the Moore Dry Dock Company case, referred to above (Case No. 20-CC-55, NLRB), a petition was filed by the union for certification as the bargaining representative of the unlicensed employes of Samsoc. As has been stated above, the vessel was registered under the laws of Panama, manned by citizens of foreign countries, and owned by a Panama corporation. The petition was dismissed on the ground that the internal economy of a vessel of foreign registry and ownership was involved. The holding does not prevent N.L.R.B. from

---

[7]Since argument on this case, our attention has been called to the case of Denver Bldg. & Const. Trades Council v. N.L.R.B. (D. C.) 186 F. (2d) 326, CCH, 6 Labor Law Rep. (4 ed.) par. 65,949), decided September 1, 1950. The above case contains a long and comprehensive discussion of the question of secondary and primary boycotts, in which many of the authorities are collected. It is, however, of little help here.

The question here is not whether we are dealing with a primary or secondary boycott, but whether our state courts or N.L.R.B. has the power to make such decision. There seems to be no doubt that respondent here is engaged in interstate and foreign commerce. The ultimate question then is—do the facts complained of fall within the field covered by the National Labor Act? If so, our courts have no jurisdiction to act in determining whether such acts are unfair labor practices.

exercising jurisdiction in a dispute involving a resident labor union and a resident employer even though the action against the resident employer is intended ultimately to bring pressure on the foreign employer, if such action interferes with interstate or foreign commerce and comes within the Labor Management Relations Act. In the Samsoc case involving picketing (Case No. 20-CC-55), the trial examiner rejected the contention that the foreign employer was not an "employer" within the meaning of the federal act, basing his conclusion on the case of Di Georgio Wine Co. 87 N.L.R.B. No. 125, CCH, 2 Labor Law Rep. (4 ed.) par. 9477. The same should be true of the Canadian Company here.

It is obvious that our state courts have no more jurisdiction over the Canadian Company or its employes or the Canadian Union or its relationship to the Canadian Company or its employes than N.L.R.B. This action is directed not against the relationship between the Canadian Company and its employes or its relationship with the Canadian Union, but against acts of defendants done in the United States, and neither seeks to regulate the relationship between the Canadian Company and its employes or the Canadian Company and the Canadian Union.

From the memorandum attached to the court's order denying relator's motion to dismiss the restraining order, it is apparent that the restraining order, as well as the order refusing to dismiss it, is based, at least in part, on a desire on the part of the court to prevent any interference with our maximum war effort in these times of emergency. Laudable as it may be to do all in our power to prevent any interference with our war effort, such desire cannot be made the basis for interpretation of our laws. It is equally important to preserve our form of government under law in these times of emergency. It is not the function of courts to construe laws in time of emergency so as to effectuate a purpose not intended by the lawmakers. If our laws are inadequate to protect our war effort from interference, it is up to congress and our legislature to make them more effective. Neither the wisdom of the

laws nor their adequacy to accomplish a desired purpose may be taken into consideration by courts in determining what interpretation the laws should have; we must give effect to them as they are, regardless of our personal opinion regarding their adequacy.[8] Furthermore, the question here is not what actions shall be taken or should be taken, but rather what tribunal has been given the power to act by law.

We have examined the other contentions of respondent, but in view of our decision on the jurisdictional question we need not determine whether the court complied with our state laws or not, nor do we think it is necessary to determine other questions raised by respondent.

The first of the three essentials for issuance of a writ of prohibition needs no comment. It appears to us that the court attempting to exercise jurisdiction has none. It follows that its order is a nullity. Relator, who may be found guilty of contempt under such void order, has no adequate remedy. The purpose of such writ is at least partially to prevent harm before it is done. It is also apparent that if the case comes within the purview of the federal act, which we believe it does, relator has an absolute right to have it heard and determined by N.L.R.B. He should not be put to the additional burden of defending himself before a court lacking jurisdiction over the subject matter. We believe all three essentials for the issuance of the writ are present, and the writ should be made absolute, with costs and disbursements to relator.

---

[8]See, concurring opinion of Chairman Herzog of N.L.R.B. In Matter of United Brotherhood of Carpenters & Joiners of America, 81 N.L.R.B. 802, 820, where he said:

"* * * The writing was not ours; the dilemma was not of this Board's making. *But because, being administrators, we are here to read and not to write, we must take the law as we find it, dilemma and all.* In deciding individual cases the Board's duty is not to seek to discover, as legislators would, the better or the worse answer. It is to enounce, as judges must, that answer which will most probably effectuate the intention of the Congress which wrote the words that we must rightly read." (Italics supplied.)

So ordered.

ON PETITION FOR REHEARING.

On February 9, 1951, the following opinion was filed:

KNUTSON, JUSTICE.

At the time the decision in this case was filed, the court had before it, in addition to the briefs, a printed record. It now appears that in addition to the printed record there was in existence a single copy of a typewritten return to the alternative writ of prohibition, which contained all that was included in the printed record and, in addition, a transcript of testimony and other proceedings had before the court subsequent to the issuance of the restraining order which we have under consideration. Such typewritten return was inadvertently overlooked until after the opinion was issued. The nature of the case was such that a speedy hearing and decision were imperative. The case was heard during vacation. We have now reconsidered the entire record thoroughly, and in order that there be no misunderstanding as to what we intended to hold we file this additional opinion.

In the petition for rehearing, counsel for respondent have seen fit to describe the printed record which we had before us as a "phony" record. It must be kept in mind that the restraining order under consideration was issued ex parte upon the complaint and affidavits submitted in connection therewith. Everything which the district court had before it when the order was issued is in the printed record which we had before us. To that extent, at least, the record we considered was complete, and there was nothing phony about it. The question brought before us by the writ of prohibition was whether the court had jurisdiction over the subject matter involved in the complaint. Jurisdiction of the subject matter is to be tested by the authorized extent of the powers of the court in respect to the cause of action before it. Carlson v. Bartels, 143 Neb. 680, 10 N. W. (2d) 671, 148 A. L. R. 658.

"The test for determining jurisdiction is ordinarily the nature of the case, as made by the complaint, and the relief sought, * * *." 21 C. J. S., Courts, § 35.

The primary function of a complaint is to state the facts constituting the cause of action. Baker v. Habedank, 202 Minn. 231, 277 N. W. 925. It must follow that the jurisdiction of the court to issue ex parte the restraining order here involved must be tested by the complaint and record made at the time it was issued. If, on such record, it appears that the court lacked jurisdiction to issue it, no subsequent proceedings could breathe life into an order that never was legally born.

Respondent now, in its petition for rehearing, takes the position that the picketing involved was primary and that it did not constitute a secondary boycott at all. That position is entirely inconsistent with respondent's complaint, as well as with all statements made by its counsel at hearings held subsequent to the issuance of the order. After alleging the facts complained of, respondent's complaint sums up the effect which the acts complained of will have upon it, as follows:

"* * * That such unlawful acts are being done to induce or compel plaintiff to refrain from doing business with said Canadian Corporation because of said failure of agreement between said Canadian Corporation and said defendant Canadian Union."

The above statement in the complaint spells out a secondary boycott if it spells out anything. If further confirmation of respondent's position is necessary, we need only refer to the typewritten transcript, which was inadvertently overlooked when the original opinion was written, wherein respondent's counsel stated the position of respondent emphatically on several occasions. At the hearing before the court on August 2, 1950, we find the following on page 5 of the transcript:

"Mr. Neimeyer: * * * The suit, as you know, is brought against certain persons who happen to be on the property of the Norris

Grain Company picketing that property so that the Norris Grain Company can't ship grain out of its elevator by a boat which happens to be here which happens to be a Canadian boat, and consequently has not been able to load that boat and is damaged and aggrieved and feels that that is a cause of action under certain sections of our statutes *which prohibits a secondary boycott.* \* \* \* We are suing people who happen to be on our property and who happen to be violating Minnesota law." (Italics supplied.)

On page 25 of the transcript we find the following:

"Mr. Neimeyer: \* \* \* Now counsel is exactly right when he says we are *bringing this action under the secondary boycott provisions* and we have stated the facts about what is being done here. The secondary boycott provisions:—I won't read the declaration of policy—" (italics supplied),

after which he proceeded to read the provisions of our state secondary boycott law. On page 27 we find the following by Mr. Neimeyer:

"Now surely *this secondary boycott law* must have been put in to meet just this situation." (Italics supplied.)

Again, on page 35 we find the following:

"The Court: How can it be a secondary boycott then?

"Mr. Neimeyer: Because it happens to be the effect of the dispute between those two people.

\* \* \* \* \*

"\* \* \* And *the secondary boycott is here*—" (Italics supplied.)

The court was of the same opinion. In its memorandum it said:

"Plaintiff contends the defendants are conducting a secondary boycott and the plaintiff is entitled to seek relief under the Minnesota Labor Relations Act but is not restricted to the remedies afforded thereunder."

It is true that relator took the opposite view, but relator's position at hearings subsequent to the issuance of the order could

hardly change the nature of the proceeding made out by the complaint, the order having been issued ex parte and relator having had no opportunity to appear at that time.

In support of its petition for rehearing, respondent has cited several cases in which the courts have held that picketing which is primary is not covered by the federal act under the circumstances there disclosed, even though such picketing might incidentally affect an innocent employer. We have no quarrel with those decisions. Respondent's difficulty here is that the court's order is based upon a complaint and record which is entirely inconsistent with any holding of primary picketing. It would serve no useful purpose to review all authorities cited by respondent. Reference to a few should suffice to show how inconsistent respondent's position is.

In Oil Workers Int'l Union (Pure Oil Co.) 84 N. L. R. B. 315, 318, June 17, 1949, we find the following statement:

"* * * In this case the Union was making certain lawful demands on Standard Oil. It was pressing these demands, in part, by picketing the Standard Oil dock. As that picketing *was confined to the immediate vicinity of Standard Oil premises* we find that it constituted permissive primary action." (Italics supplied.)

In United Electrical, Radio and Machine Workers of America (Ryan Construction Corp.) 85 N. L. R. B. 417, 418, July 28, 1949, the board said:

"* * * It [referring to the federal act] was intended only to outlaw certain *secondary* boycotts whereby unions sought to enlarge the economic battleground beyond the premises of the primary Employer. When picketing is wholly at the premises of the employer with whom the union is engaged in a labor dispute, it cannot be called 'secondary' even though, as is virtually always the case, an object of the picketing is to dissuade all persons from entering such premises for business reasons."

Contrast these statements with those of respondent's counsel before the trial court. On page 5 of the typewritten return Mr. Neimeyer said: "The suit, * * * is brought against certain persons who happen to be *on the property of the Norris Grain Company.*" (Italics supplied.) On page 19 Mr. Neimeyer said: "They happen to be picketing on Norris Grain Company property. There is no question about that, and they are trespassing." On page 20 we find the following: "Mr. Neimeyer: I am talking about where they are. They are on Norris Grain Company property."

In order that our position may be completely clarified, it was and is our holding that the complaint and record presented to the trial court upon which an ex parte restraining order was issued present facts which, on their face, constitute a secondary boycott; that respondent is engaged in interstate commerce; that secondary boycotts are within the scope of the Taft-Hartley Act; that the National Labor Relations Board has exclusive jurisdiction over such labor dispute; and that as a result the state court had no jurisdiction to issue the restraining order.

With the clarification contained herein, we adhere to our former opinion, and the petition for rehearing is denied.

MR. JUSTICE MAGNEY took no part in the consideration or decision of this case.